**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Educational Credit Management Corp., ) | No. CV-07-1542-PHX-FJM |
| ) | |
| Appellant, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Mary E. Stockman, ) | |
| ) | |
| Appellee. ) | |
| ) | |
| _____ ) | |

    Appellant Educational Credit Management Corp. ("ECMC") appeals an order of the United States Bankruptcy Court for the District of Arizona partially discharging appellee Mary E. Stockman's educational loan debt. We have jurisdiction pursuant to 28 U.S.C. § 158(a)(1). The court has before it the record on appeal ("RA") (doc. 19), ECMC's opening brief (doc. 30), Stockman's response (doc. 32), and ECMC's reply (doc. 34).

**I**

    After working as a successful real estate agent for 26 years, Stockman returned to college to finish her undergraduate degree, then entered the University of Miami law school in 1995 at age 48. It turned out to be a tough career move. Though she graduated cum laude in 1998, Stockman had difficulty finding legal employment. In July 1999, she established a modest solo bankruptcy practice in Phoenix.

1   Stockman financed the massive costs of her legal education primarily through federally guaranteed student loans. In 2003, she consolidated over $100,000 in loans taken out pursuant to the Federal Family Education Loan Program ("FFELP"). At the peak of her bankruptcy practice in 2004, Stockman earned $57,000, but could not pay her debts. In June 2005, she filed for bankruptcy. She has since abandoned law and returned to Florida, where she now works on commission as a mortgage broker.

On October 10, 2005, Stockman brought adversary proceedings in the bankruptcy court seeking to discharge her student loan debts. ECMC is a guarantor under the FFELP. Stockman's consolidated FFELP debt was assigned to ECMC for the purposes of the adversary proceedings. As of June 5, 2007, Stockman owed ECMC $150,782.85. After an evidentiary hearing on June 19, 2007, the bankruptcy court entered an order dated July 27, 2007, discharging all but $18,360 of that debt. ECMC appeals the ruling.

**II**

Government guaranteed student loans cannot be discharged in bankruptcy unless failure to discharge "will impose an undue hardship on the debtor." 11 U.S.C. § 523(a)(8). Because the phrase "undue hardship" is not statutorily defined, its interpretation has been left to the courts. This circuit applies a three-prong test to determine whether exempting student loan debt from discharge would impose an undue hardship. United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108 (9th Cir. 1998). By a preponderance of the evidence, the debtor must show 1) that she cannot maintain a minimal standard of living based on current income and expenses if required to repay the loan, 2) that additional circumstances indicate that the state of affairs is likely to persist for a significant portion of the repayment period, and 3) that she has made a good faith effort to repay the loan. Id. at 1111–12. Although the bankruptcy court is permitted to partially discharge student loan debts, the In re Pena test must still be satisfied in its entirety. Saxman v. Educ. Credit Mgmt. Corp., 325 F.3d 1168, 1174 (9th Cir. 2003) ("[Otherwise, there is the] very real potential to eviscerate the statutorily-based undue hardship provision.").

The undue hardship provision represents strong federal policy against discharging government-backed student loans. The debtor's burden of proof to show undue hardship is high. Student loans are unique because they "are made without business considerations, without security, without cosigners, and rely for repayment solely on the debtor's future increased income resulting from the education." In re Roberson, 999 F.2d 1132, 1135–36 (7th Cir. 1993) (quoting H.R. Rep. No. 95-595, at 133 (1977)). In re Pena relies on Brunner v. New York State Higher Education Services Corp., 46 B.R. 752 (S.D.N.Y. 1985), where the court explained,

> Because of [the government's] enlightened social policy, those whose past work or credit record might foreclose them from the commercial loan market are able to obtain credit at subsidized rates to advance their education. Those who might obtain loans at exorbitant rates are similarly able to obtain low cost, deferred loans. Through § 523(a)(8) [the government exacts a quid pro quo and] commits the student to repayment regardless of his or her subsequent economic circumstances. In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances.

Id. at 756; see also Educ. Credit Mgmt. Corp. v. Nys, 446 F.3d 938, 944 (9th Cir. 2006) (noting congressional recognition, prior to enacting the undue hardship provision, of the "high incidence of students filing for bankruptcy after finishing their education").

ECMC contends that Stockman did not satisfy the In re Pena test. We review a bankruptcy court's factual findings for clear error and legal conclusions de novo. In re First T.D. & Inv., Inc., 253, F.3d 520, 526 (9th Cir. 2001).

**III**

For the first prong of the In re Pena test, the bankruptcy court established Stockman's budget in order to determine whether she could repay her student loan debt and still maintain a minimal standard of living. Stockman now contends that various circumstances since the bankruptcy court's ruling have decreased her income and increased her expenses. However, this is not the time or place for Stockman to relitigate factual findings with evidence that was not before the bankruptcy court. Our task is to review the determinations of the bankruptcy court based on the evidence that it considered.

1       The court found plaintiff's foreseeable annual income to be $47,300, or $3,208 a
2  month after taxes. RA at 219–20. The court also explicitly approved the following monthly
3  expenses:  1) $1,100 for rent, 2) $70 for phone service, 3) $300 for food and medicine,
4  4) $115 for auto insurance, 5) $290 for gas, 6) $100 for auto repair, 7) $344 for medical
5  insurance, 8) $25 for bar fees, 9) $45 for clothing, 10) $15 for entertainment, 11) $15 for
6  contingency, and 12) $200 for tithing. RA at 1-214, 1-220, 1-221, 1-223, 12-Ex. A. The
7  court also explicitly disallowed certain proposed expenses, such as life insurance. RA at 221.
8  The above figures total $2,619 in expenses, leaving $589 in excess income. However, after
9  enumerating the above expenses, the bankruptcy court stated, "That then yields a total
10 expense of 2500—or $2954, leaving essentially $250 available under my calculations." RA
11 at 223.  The court used that figure ($250) not only to determine that full repayment was
12 impossible, but also to set the amount of partial repayment.

13      As ECMC contends, there is both ambiguity ($2,500 or $2,954) and discrepancy
14 ($589 or $250) in the calculation.  Stockman contends that the bankruptcy court tacitly
15 accounted for other expenses in her proposed budget, such as additional utilities,
16 contact lenses, and business expenses. Responsive Brief at 5–6. However, we have nothing
17 to go on but the transcript of the evidentiary hearing. Because the specifically enumerated
18 expenses do not add up, we must conclude that the calculation is clearly erroneous.

19      ECMC also draws our attention to the $200 a month allotted for tithing. The facts
20 show that Stockman does not have an extensive history of tithing and admits that tithing is
21 not a requirement for participation in her church. RA at 141–42. We conclude that the $200
22 tithing allotment is unreasonable as a matter of law. Certainly some amount of charitable
23 giving is a reasonable allowance for any debtor, but $200 a month for a debtor who is
24 hundreds of thousands of dollars in debt is beyond the pale. We do not question Stockman's
25 earnestness in wanting to contribute to her church, but at this point she simply does not have
26 the resources for such generosity. There is no basis for so large an allocation, whatever
27 Stockman's convictions. See Waguespack v. Rodriguez, 220 B.R. 31, 34 (W.D. La. 1998)
28 ("[A debtor] cannot, in good faith, on the one hand voluntarily seek the financial safety

1 and protection afforded by the bulwark of federal bankruptcy law and on the other, decry
2 its religiously-neutral requirements."). Indeed, a reputable church would neither solicit nor
3 accept such a large donation if it knew it was at the expense of legitimate creditors. The
4 charitable contribution allotment should be significantly reduced.

5 Because there are uncertainties whether Stockman has satisfied prong one of the In
6 re Pena test—whether repayment is compatible with a minimal standard of living—we
7 cannot address prong two—whether her inability to repay will persist. However, if the
8 bankruptcy court again determines that Stockman is unable to make full repayment, contrary
9 to ECMC's contention, it is not error to consider Stockman's age and uncertain job prospects
10 in determining whether her circumstances are likely to continue.

**IV**

12 Finally we address whether, under prong three of In re Pena, Stockman made a good
13 faith effort to repay. By the time of the bankruptcy proceeding, Stockman owed over
14 $150,000 in principal and interest on her federally backed student loans. ECMC's Reply
15 at 13. She also owed tens of thousands of dollars on private loans, which have also been
16 partially discharged. Stockman admittedly made little effort to lower her monthly payments
17 with available federal programs. The bankruptcy court found that Stockman "has not agreed
18 to participate in the Ford program, or has not really seriously considered it," RA at 217, but
19 concluded that failure to "comply with the Ford program is not itself a sign of bad faith." RA
20 at 225. We agree that failure to participate in loan restructuring is not determinative, but the
21 burden is not on the lender to show bad faith, but on the debtor to show good faith effort to
22 repay the loans. In re Pena, 155 F.3d at 1111. Discharge of federally backed student loans
23 in bankruptcy is the exception, not the rule, and the standard for discharge is high.

24 In the several years between the start of the loan repayment period and her
25 bankruptcy, Stockman managed to pay over $15,000 toward her loan obligations. However,
26 only $200.77 went to her federally backed loans. RA at 131. ECMC contends that this
27 defeats a showing of good faith effort to repay. Stockman claims that she could not tell
28 which loans she was paying down. RA at 132. The bankruptcy court concluded, "There was

1 not evidence that the payments were directed to one lender and not to the other, which I think
2 . . . would be an indication of bad faith." RA at 225.  However, we conclude that because
3 it is her burden to establish *good faith*, Stockman must supply the bankruptcy court with an
4 affirmative, plausible explanation as to how one lender received significant repayment at the
5 nearly complete expense of the other.

6 We recognize that the management of multiple loans, handled by different lenders,
7 can be complicated for the ordinary consumer.  But Stockman is no ordinary consumer.  She
8 has a law degree and has worked as a real estate agent, a bankruptcy lawyer, and a mortgage
9 broker.   Stockman is eminently qualified to understand her debt.   She is not only
10 unapologetic about her failure to meet her debts, but indignant:  "[ECMC] must take some
11 responsibility for making a loan to a woman who was way too old to establish herself in a
12 legal profession." Stockman's Response at 8.  Yet, as ECMC points out, a defining feature
13 of the FFELP is that loans are widely available, and lenders certainly cannot discriminate on
14 the basis of age.  20 U.S.C. § 1071(a)(2).  Stockman is not entitled to the discharge of her
15 federally backed student loans merely because full repayment is unlikely.  Under the third
16 prong of In re Pena, Stockman has the burden to show good faith.  We remand and take no
17 position on the ultimate issue whether Stockman's federally backed loans are dischargeable
18 in whole or in part.

**V**

20 For the foregoing reasons, **IT IS HEREBY ORDERED VACATING** the bankruptcy
21 court's order of July 27, 2007 (RA, Ex. 14), insofar as it discharges debts owed appellant
22 ECMC.  **IT IS FURTHER ORDERED REMANDING** this case to the bankruptcy court

1   for proceedings not inconsistent with this opinion.  All issues before this court having been
2   resolved, the clerk is directed to enter final judgment.

       DATED this 4th day of April, 2008.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge